# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE, v. GARY LAMAR MCBRIDE.

**Direct Appeal from the Circuit Court for Davidson County**
**No. 97-D-2164     J. Randall Wyatt, Judge**

---

### No. M1999-00319-CCA-R3-CD - Decided April 7, 2000

---

The defendant/appellant, Gary Lamar McBride, appeals as of right from a conviction for murder second degree by a Davidson County jury. The Davidson County Criminal Court imposed a sentence of sixteen (16) years in the Department of Correction. The defendant presents three appellate issues:

1. Whether the trial court erred in allowing the defendant's statement to be read to the jury and not suppressing the same.
2. Whether the trial court erred in not finding that the proof adduced at trial by the State is in conflict with the physical facts rule applicable to criminal cases.
3. Whether the evidence adduced at trial was sufficient to convict the defendant of murder second degree.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

LAFFERTY, SR. J., delivered the opinion of the court, in which WELLES, J., and WOODALL, J., joined.

Jack A. Butler, Nashville, Tennessee, for the appellant, Gary Lamar McBride.

Paul G. Summers, Attorney General and Reporter, and Elizabeth T. Ryan, Assistant Attorney General, for the appellee, State of Tennessee.

### OPINION

At trial, Detective Alfred E. Gray, III, Metro Police Department Homicide Bureau, testified that he went to the scene of the death of Michael Wright. He stated that the crime scene was the 500 block of 13th Avenue North near the Jo Johnston Public Projects in Davidson County. From the photographs taken at the crime scene, Detective Gray identified a live .45 caliber round, three (3) spent casings from a .45 caliber, a second live round .45 caliber that had been run over, the victim and the victim's car. The next day, Detective Gray stated that he returned to the crime scene and found some car keys belonging to a Cadillac. He testified that he received information that some people in a white Cadillac were responsible for the shooting. The white Cadillac was recovered at the crime scene and dusted for fingerprints. Detective Gray stated that a fingerprint of the defendant was recovered from the car. According to Detective Gray, the material in the Cadillac indicated that

the defendant attended Pearl-Cohn High School. He testified that the defendant had contacted a school police officer and told the officer that he (the defendant) wanted to see Detective Gray. When Detective Gray arrived at the school, the defendant advised him that some people were trying to say that he (the defendant) had something to do with a murder, but he was not there. Detective Gray stated that when he told the defendant about finding his car keys at the scene, the defendant became upset and told Detective Gray about the incident.

Detective Gray advised the jury of the defendant's account of his meeting with the victim, Michael Wright:

> [H]e went on to tell -- to tell me that guy robbed him a week ago, robbed him for about five or ten dollars. And every time this guy would see him after that he would always just keep harassing him, hounding him, telling him, hey, we okay, it's cool. He said that he thought this guy was following him. He said on another occasion he was over to his brother's, and he saw the victim just parked outside his house. He -- he said that he thought that his brother was going to be robbed or he was just going to come in there and rob the house that he was living in or where he was staying with his brother. He also was telling me about his nephew. Like I said, he was upset and telling me about his nephew. He told me about prior, when he was playing basketball, and this guy, the victim was following him there also. He's telling me that his brother didn't have anything to do with it, but he wasn't going to let anything happen to his brother or his nephew.
>
> ***
>
> Well, he said that he saw the day that he was over to his mother's house at John Henry Hale, he saw the -- he saw the victim going to his car. And he said he armed hisself [sic] with a .45, because he thought the victim would be armed. And he went over to talk to the victim to ask him why he was going -- why this guy was just constantly messing with him. He said an argument -- the guy got to arguing about it. And then the guy raised his shirt. And he said he saw a gun…. [H]e just started shooting at him. He said, then the guy was running on all fours, meaning his hands and knees into the field. He said he ran him down. And he knew that -- he knew that with the .45 that he could put him down. So he said he had to take care of his business. And he shot the victim once.

Detective Gray stated that he did not find a gun around the victim and about forty (40) to fifty (50) people were standing around the crime scene. The detective testified that the victim was known to carry a gun.

Sergeant Dana Lyon with the Metro Police Department testified that on May 12, 1997, he

-2-

went to the crime scene on 13th Avenue North, Jo Johnston area, regarding a shooting. He stated that while walking through a field adjacent to the street, he found a male, who had been shot in the back of the head and leg, lying on the ground. Sergeant Lyon stated that he found no weapons near the area of the body.

David S. Levitt of the Nashville Fire Department testified that he was dispatched to a field off 13th Avenue and Jo Johnston. After examining a male, about 30, Mr. Levitt determined that the male was dead. In searching the body, Mr. Levitt found some money and a small pocket knife, but no weapon.

Detective Clifford William Mann with the Metro Police Department testified that he was dispatched to the crime scene and observed a male laying in an open grassy area off 13th Avenue. Detective Mann stated that he did not see a weapon in the area. In canvassing the area, Detective Mann stated that it was difficult to obtain any information, due to the residents' fear of retaliation.

Andrew Levan Fleming testified that he was a friend of Michael Wright, the victim. He stated that he saw the victim leaving through the front door of 523 13th Avenue. Approximately three (3) minutes later, Mr. Fleming heard gunshots. He looked out of the door and saw a group of men at the end of the sidewalk. Mr. Fleming heard one of the men say, "No, Man." Mr. Fleming testified that he did not know if the victim had a gun with him that night, but the victim was known to carry a gun.

In rebuttal by the State, Mr. Fleming testified that he talked to the defendant about his upcoming testimony in court. This conversation took place at the Jo Johnston Market Store. He stated that the defendant, his brother, Aaron ("Muffin") McBride, Tasha Adams, the defendant's mother, and two other males were present. One of the males had a gun imprint under his jacket. Mr. Fleming told the defendant and his brother that he did not know anything. He stated that he felt threatened and afraid but admitted no specific threats were made.

Tammy Sherese Samuels testified that she was on her way to the store on 13th Avenue North. She stated that she heard the words, "You got me," then a gunshot, and the words, "Help me." She stated that she did not see anything.

It was stipulated by the State and the defendant that the autopsy findings of Dr. Bruce Levy, a pathologist, would establish that Michael Wright, age 25, had been shot twice, once in the right thigh above the knee and once in the back of the skull. Dr. Levy determined that the cause of death was a gunshot wound to the head.

In his defense, the defendant testified that, at the time of the incident, he was sixteen (16) years of age and attended Pearl-Cohn High School. He stated that he had known Michael Wright for about four (4) years. On April 26, 1997, the defendant stated that he and his date, Shasta Webb, were on their way to a prom when they were accosted by Mr. Wright. Mr. Wright had a gun and asked for the defendant's money. The defendant gave Mr. Wright approximately fifty ($50) to sixty ($60) dollars. On another occasion, the defendant testified that he was going to a Slam Dunk

Contest when he was again approached by the victim. The victim came up to the car the defendant was in, raised his shirt, pulled a gun, and asked for the defendant's money. The defendant gave the victim approximately fifty ($50) to sixty ($60) dollars. The defendant stated that he did not call the police about these two robberies, because the victim had threatened his life. The defendant stated that the victim stalked him at various places. The victim threatened to harm not only the defendant, but his family and particularly his mother. The defendant testified that, on one occasion, the victim tried to rob Carl Holder. When Mr. Holder tried to run, the victim shot him. The defendant also testified that the victim entered the home of Van Hammond, taped up Mr. Hammond's wife, and then shot Mr. Hammond. In another incident, the defendant stated that the victim attempted to rob the cousin of Robert Moore and shot the cousin in the face.

On the day of the incident, the defendant testified that he was at his mother's home and saw the victim getting into his car. The defendant approached the victim and asked the victim if he could have a word with him. The victim got out of his car, and the two exchanged words. The victim then got upset and raised his shirt. The defendant saw that the victim had a weapon. The defendant grabbed his gun and shot at the victim. The victim ran, stooping, while the defendant was shooting at him. The defendant testified that the victim appeared to be trying to get his gun out. The defendant chased the victim, who fell over a branch in the field. The victim was on his back and appeared to be reaching for something, so the defendant fired again. Prior to the encounter, the defendant stated that he had no intention of killing the victim. The defendant testified that he has always been cautious of the victim.

In cross-examination, the defendant denied that the victim was crawling on his hands and knees on the ground, as reportedly told to Detective Gray. The defendant admitted that he said "he had to take care of his business." Also, the defendant admitted that he was driving a white Cadillac that evening when he lost his keys.

Carl Holder testified that he had known Michael Wright for twelve (12) years. In November, 1995, he stated that Mr. Wright had followed him from a store and demanded some money. When Mr. Holder refused to give the victim his money, the victim pulled a gun and shot Mr. Holder. The witness stated that he ran, but Mr. Wright caught him and took his money. Mr. Holder testified that Mr. Wright had a .44 or .45 caliber weapon. Mr. Holder told the defendant about this incident.

Phyllis A. Richardson, mother of the defendant, testified that she had known Michael Wright for about five (5) years and that he had a violent reputation. Mrs. Richardson testified that Mr. Wright had an altercation with Mr. Calvin Crump, her employer. Mrs. Richardson testified that she would close the club owned by Mr. Crump at about 4 a.m. and take Mr. Crump's money home with her. In April, 1997, Mrs. Richardson stated that Mr. Wright told her that he knew she worked at the club at night, that she closed the club at 4 a.m., and that he was going to catch her before she got home. Mrs. Richardson testified that this encounter with Mr. Wright scared her, and, as a result, she stayed with her daughter for a few days. She stated that she did not tell her son about this encounter with Mr. Wright.

Shasta Webb testified that she had known Michael Wright for about three (3) years. On April

26, 1997, she stated that she and the defendant were going to a prom and "Little Bit," the victim, raised his shirt to the defendant and demanded his money. The defendant gave Mr. Wright his money. Ms. Webb stated that she was scared but did not tell the police, because Mr. Wright threatened to kill her and the defendant if they told anyone.

## LEGAL ANALYSIS
## PART A
## SUFFICIENCY OF EVIDENCE

Since the defendant raises a sufficiency of evidence issue, we elect to address the issues in reverse order. The defendant contends that the facts in this case are insufficient to find him guilty beyond a reasonable doubt in the face of his assertion of self-defense. Further, the defendant asserts that the evidence overwhelmingly constituted self-defense, thus, a complete defense to the offense of murder. The State counters that the evidence fully supports a conviction for second degree murder.

When reviewing a trial court's judgment, the appellate court will not disturb a verdict of guilty unless the facts in the record and inferences which may be drawn from it are insufficient as a matter of law for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Tenn. R. App. P. 13 (e); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *State v. Brewer,* 932 S.W.2d 1, 17 (Tenn. Crim. App. 1996). Initially, a defendant is cloaked with the presumption of innocence. *Tuggle,* 639 S.W.2d at 914. However, a jury conviction removes the presumption of innocence and replaces it with one of guilt, so that, on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *Id.* In determining the sufficiency of evidence, this Court does not reweigh or re-evaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). It is the appellate court's duty to affirm the conviction, if the evidence viewed under these standards was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn. 1994). This rule is applicable to findings of guilt predicated upon the direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The pertinent part of Tennessee Code Annotated § 39-11-611 provides:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.

There is no duty to retreat before a person threatens or uses force.

If a defendant has a genuine, well-founded fear that he was in danger of death or serious bodily injury, self-defense is an available plea. Tenn. Code Ann. § 39-11-611; *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Although the burden of proof was not on the defendant to establish that he acted in his own necessary self-defense, the defense presented a question for the exclusive determination of the jury. In light of the fact that the jury found the defendant guilty of second degree murder, it appears that the jury simply did not believe the defendant's version of the shooting. *Henley v. State,* 520 S.W.2d 361, 363 (Tenn. Crim. App.), *cert. denied* (Tenn. 1975). The evidence before the jury, established that on May 12, 1997, the defendant and the victim met outside the defendant's mother's home. The defendant approached the victim with the intention to resolve past differences. However, the victim became angry and upset. According to the defendant, the victim raised his shirt revealing a gun. The defendant, in response to this situation, pulled his .45 caliber pistol and shot at the victim. The victim crawled away on his hands and knees. The defendant followed the victim and shot him in the back of the head. The jury was made aware of the victim's violent past to determine if the defendant had a genuine and reasonable fear that it was absolutely necessary to shoot the victim. By its verdict, the jury rejected the defendant's theory of self-defense. We find that there is sufficient evidence in the record to support the jury's verdict. There is no merit to this issue.

## PART B
## PHYSICAL FACTS RULE

The defendant contends that the evidence adduced in this case is in conflict with the physical facts rule as set forth in *State v. Hornsby,* 858 S.W.2d 892, 894 (Tenn. 1993). The State argues that the testimony of witnesses at trial were not in conflict with the physical facts and was properly considered by the jury.

In *State v. Hornsby,* our Supreme Court held that the physical facts rule is applicable to criminal cases. The so-called "physical facts rule" is the accepted proposition that testimony that is irreconcilable with the physical evidence can be disregarded. *Id.* In other words, where the testimony of a witness cannot possibly be true, courts can find the testimony to be incredible as a matter of law and decline to consider it. *Id.* Our courts have correctly observed that the facts used to negate testimony must be "well-established and universally recognized physical laws." *Id.* (citing *Nelms v. Tennessee Farmers Mut. Ins. Co.,* 613 S.W.2d 481, 483 (Tenn. Ct. App. 1978)).

The defendant contends that the physical facts would indicate that the confrontation with the victim occurred on the right side of the victim's car, where shells and casings were found. Therefore, the defendant's version is believable. Further, the defendant testified that while the victim was running away, the victim was trying to get his gun, and the reason the defendant pursued the victim was because the confrontation never ended. The victim fell over a branch and fell on his back and appeared to the defendant to be reaching for something. The defendant contends that the victim was twisted to where he was on his back, indicating that the victim was reaching for something when he was shot. The State argues that the evidence establishes that the victim, when

alighting from his car, came around to the defendant on the passenger's side of the vehicle.

From our analysis of the record, the jury had before them the actual physical evidence obtained from the crime scene, coupled with the defendant's testimony as to his and the victim's positions when the victim got out of his car. Likewise, the jury had heard the testimony of Detective Gray that the defendant told him that the victim was crawling away on all fours when he shot him. The jury had the benefit of the defendant's testimony as to his past experiences with the victim, the victim's running and falling, and the defendant's shooting of the victim as the victim appeared to be reaching for something. Medical proof established that the defendant was shot in the back of the head, which would cloud the believability of the defendant's version of the events. Based upon this evidence, the jury found the defendant guilty. We find that the evidence does not conflict with any physical facts. There is no merit to this issue.

### PART C
### MOTION TO SUPPRESS

The defendant asserts that the trial court was in error for allowing the statement made by the defendant to Detective Alfred Gray on May 16, 1997, to be admitted into evidence. The defendant contends that the statement was given during a custodial interrogation, without benefits of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966). Further, the defendant contends that the statement was taken in violation of Rule 7(d) of the Tennessee Rules of Juvenile Procedure. The State asserts that the trial court was correct in finding that the defendant was not in custody at the time of the statement, and Rule 7(d) of the Tennessee Rules of Juvenile Procedure was not applicable.

At the motion to suppress hearing, Detective Al Gray of the Metro Police Department, Homicide Division, testified that he received a phone call from Officer Tabatha Koger indicating that the defendant, who was a student at Pearl-Cohn High School, wanted to see him. In the guidance room at the high school, Detective Gray identified himself by showing his badge and asked the defendant if the defendant knew why he was there. The defendant responded that some people at the high school had told him that the detective had been at the school looking for him regarding a murder. The defendant denied being involved in a murder. Detective Gray advised the defendant that his car keys were found at the scene, lying next to the body of the victim. The defendant began telling Detective Gray how Michael ("Little Bit") Wright, the victim, constantly harassed him and had robbed him in the past. He also told the detective his version of why and how he shot the victim. On the day of the incident, the defendant stated that he saw Mr. Wright in the Jo Johnston Housing projects. He went to talk to Mr. Wright about why he was constantly harassing him and why he was constantly picking on him. The victim raised his shirt, and the defendant thought that he saw a gun. The defendant stated that he was armed with a .45, because he knew that the victim was always armed. He stated that he started shooting at the victim and that the victim started crawling on all fours, meaning his hands and knees. The defendant followed him over to a grassy area, knowing that he had to take care of his business. He knew that the .45 would put the victim down, so he shot him, once.

-7-

At the conclusion of the statement, the defendant asked Detective Gray if he needed an attorney. Detective Gray answered yes. The defendant stated that he had an attorney, who had advised him not to say anything; however, he wanted to tell Detective Gray what happened, so that his brother would not be involved. Detective Gray testified that prior to the defendant's statement, he was not under arrest, because the officer had no grounds for an arrest. After the defendant gave his statement, Detective Gray placed the defendant under arrest and advised him of his *Miranda* rights. Detective Gray advised the trial court that, at the beginning of the statement, he did not advise the defendant of his *Miranda* rights or obtain a wavier of rights. He testified that if the defendant had advised him that he did not wish to make a statement, he would have been free to go.

In its ruling, the trial court found that the better practice would have been to advise the defendant of his *Miranda* rights, but the defendant was not in custody. The trial court found that the defendant initiated the statement given to Detective Gray and that it was spontaneous. As to the alleged violation of Rule 7(d), Tennessee Rules of Juvenile Procedure, the trial court found that rule applicable to a juvenile in the custody of a detention facility.

The standard of review of a trial court's findings of fact in a suppression hearing is by a preponderance of the evidence. "So long as the greater weight of the evidence supports the trial court's findings, those findings will be upheld." *State v. Yeargan,* 958 S.W.2d 626, 628 (Tenn. 1997) (citing *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996)). However, the application of the law to the trial court's finding of facts is a question of law, which this Court reviews *de novo. Id.*

The defendant asserts that after his denial of involvement in the homicide, Detective Gray's statement that the defendant's keys were found at the scene pressured the defendant into giving incriminating statements. Thus, this was an interrogation under Tennessee law. Further, the defendant asserts that he was in custody when he was interrogated, and, therefore, he should have been given his *Miranda* rights. The State counters that the defendant was not in custody, and, therefore, under these facts, the legal requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), were not mandatory.

Custodial interrogation was defined by the Supreme Court as "questioning initiated by law enforcement officers after a person had been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S. Ct. at 1612. The determination of whether an individual is in "custody" and entitled to *Miranda* warnings is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. The test is objective from the view-point of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question. *State v. Anderson,* 937 S.W.2d 851, 855 (Tenn. 1996).

Applying these holdings to the facts in this case, we find that the defendant was not in custody at the time he gave his statement to Detective Gray. The record establishes that the defendant, when he learned that the police wished to talk to him about a murder, called Detective Gray. The interview took place in a high school guidance room. The defendant denied any

involvement in a murder, but when Detective Gray, in an open-ended statement, advised the defendant that his car keys were found at the scene, the defendant elected to tell Detective Gray about the incident leading to the shooting of the victim. We agree with the trial court that the defendant initiated the meeting with Detective Gray, and his statement was spontaneous when advised about his keys.

The defendant complains that the statement given to Detective Gray was inadmissible in that the procedure to obtain his statement was in violation of Rule 7(d), Tennessee Rules of Juvenile Procedure.

This Rule provides:

> (d) Interrogation. Intimidative or coercive methods shall never be used in questioning children. If feasible, a parent or guardian should be present during questioning. In any event, no child having been placed in and present in a detention facility shall be interrogated concerning an alleged violation of the law, unless the child intelligently waives in writing the right to remain silent.

It is clear from reading Rule 7, that this rule sets forth the rights of a juvenile once he or she is taken into custody and placed in a juvenile detention facility. The record clearly reflects that the guidance room of a high school is not a detention facility, and we decline the defendant's request to equate a guidance room with a detention facility. Since we have already determined that the defendant gave a free and voluntary statement during a time in which he was not in custody, there is no violation of this Rule 7(d) provision. We find that there is no merit to this issue.

The trial court's judgment is affirmed.